*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2012-349

FEBURARY TERM, 2013

| | |
|---|---|
| In re D.D., Juvenile | APPEALED FROM: |

Superior Court, Windham Unit,
Family Division

DOCKET NO. 108-9-11 Wmjv

Trial Judge: John P. Wesley

In the above-entitled cause, the Clerk will enter:

Mother appeals an order of the superior court, family division, terminating her residual parental rights with respect to her son, D.D. We affirm.

D.D. was born in June 2005 and lived with mother until May 2009, when mother's deepening addiction to drugs led her to place D.D. with his grandmother. Two months later, mother moved D.D. from his grandmother's home to his aunt's home. In July 2009, mother was incarcerated. During her incarceration, she consented to the aunt being appointed D.D.'s legal guardian.

In April 2010, mother entered into a comprehensive plea agreement in which she admitted to probation violations and pleaded guilty to charges of retail theft, possession of heroin, and possession of a regulated drug. She remained incarcerated until May 2010, when she was furloughed. During the next eight months, mother's furlough was revoked on three occasions because of her continued drug use. In March 2011, mother was admitted to the Brattleboro Retreat, where she attempted suicide and engaged in self-harming behaviors. Following her release from the Retreat in the summer of 2011, she continued her drug use and attempted suicide on two more occasions.

Meanwhile, in May 2011, the aunt, D.D.'s guardian, was arrested as part of a drug investigation. In June 2011, the aunt stipulated to D.D. being a child in need of care or supervision (CHINS). The Department for Children and Families (DCF) filed a case plan recommending reunification between D.D. and the aunt. In July 2011, the aunt was murdered, possibly as the result of a drug-related dispute. Following the aunt's murder, the case plan goal changed to termination of parental rights.

Because mother was consistent in weekly visits during a three-month period in late summer and early fall of 2011, however, a modified case plan set forth a concurrent goal of reunification with mother. The new case plan required mother, among other things, to complete furlough in good standing, avoid criminal conduct, participate in planned visits, maintain safe housing, participate in drug screening, follow recommendations for treatment, document her drug-free status, and engage in therapy to address mental health issues.

In October 2011, mother was arrested for violating her conditions of furlough after drug paraphernalia was found in her apartment. Two months later, she was arrested for shoplifting. In March 2012, she was incarcerated after testing positive for cocaine, suboxone, and benezedrine. Following mother's incarceration, DCF sought termination of her parental rights. Mother was released from furlough in August 2012 but will remain under the supervision of the Department of Corrections until June 2013.

The termination hearing was held on August 17, 2012. Following the hearing, the family court issued a decision terminating mother's parental rights. The court found that mother's problems with the criminal justice system had deepened, that mother had failed to meet the case plan goals, and that her life of cycling between jail and community supervision had been accompanied by multiple threats of suicide and self-harming behaviors. The court concluded that mother's inability to remain out of jail or to adhere to case plan goals demonstrated "that she is unlikely to be in a position to provide competently for [D.D.s] needs within any period of time short enough to be consistent with his right to the security of a permanent placement." Stating that this case "is a discouraging revelation of the terribly vulnerable predicaments into which infants and young children are abandoned when their parents fall prey to the scourge of drug using, and the criminal lifestyles necessary to sustain resulting addictions," the court concluded that D.D.'s need to be in a safe and secure home trumped his tenuous relationship with mother.

On appeal, mother argues that the record does not support the court's assessment of her relationship with D.D. Mother focuses particularly on the following statements in the court's discussion:

> More importantly, at two junctures just as visits were beginning to generate promising bonding between Mother and [D.D.], Mother's criminal and antisocial behaviors broke the continuity of that connection when furlough violations sent her back to jail. The first hiatus in October 2011 was a matter of weeks, but the second one in March 2012 has lasted more than five months. DCF predictably and properly concluded that the child's well-being was too fragile to risk further dashed expectations of reattachment. From the child's perspective, it is likely that Mother's commitment to the visits she managed to attend were more harmful than helpful, because her criminal behavior caused them to be drastically interrupted. To [D.D.], each time Mother went back to jail marked another wrenching disappointment of losing a loved one, just as he had begun to imagine having her in his life again.

According to mother, the record does not support the court's speculation that her visits were more harmful than helpful because of the supposed harmful effects on D.D. resulting from interruptions in those visits. Mother further argues that the court's speculation on the harmfulness of the visits did not satisfy the requirement that its conclusions be supported by clear and convincing evidence. See In re R.W., 2011 VT 124, ¶ 14, 191 Vt. 108 ("[T]he trial court must find stagnation, as well as best interests, by clear and convincing evidence.").

Neither of these arguments supports disturbing the family court's termination decision. The court found that there was still a bond between mother and D.D., despite the limited contact between them during the previous two years, as evidenced by D.D.'s desire to maintain contact with mother. Indeed, it is the evidence of that continuing bond that led the court to surmise that the multiple interruptions in mother's visits with D.D. likely resulted in the visits being more

harmful than helpful to the child.  The court did not suggest that its supposition on this point was based on clear and convincing evidence; rather, the court applied "its own common sense and experience in reaching a reasoned judgment."  Payrits v. Payrits, 171 Vt. 50, 53 (2000).  In any event, the court's ultimate determination that D.D.'s best interests required terminating mother's parental rights was based primarily on clear and convincing evidence that mother was unable to stay out of jail and address the multiple drug-related and mental health issues that prevented her from safely parenting D.D.  The record contains overwhelming evidence to support the court's conclusions that mother had made virtually no progress toward being able to parent D.D. and would not be able to undertake that responsibility within a reasonable period of time.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Brian L. Burgess, Associate Justice

3